Good morning. Susan Kumagai for Appellant AT&T Benefits Plan No. 1. I'd like to reserve two minutes of rebuttal, if I may. This appeal raises two issues. One, did the third-party claims administrator Sedgwick abuse its discretion when it decided to deny short-term disability benefits to appellee Marcus May? The second issue is, if the court does affirm that ruling and finds that there was an abuse of discretion, is the proper remedy to remand to the claims administrator for an award of benefits for the entire period available under the plan? This case involves no inherent conflict, so there is no requirement of weighing of the evidence. It is a straightforward abuse of discretion standard. And Sedgwick's decision below should not be disturbed, if reasonable. The district court below found an abuse of discretion based on three grounds. One, he found that there was no change of medical condition from the time that the – that Sedgwick approved the claims until the final decision to deny. Second, it found that the independent physician advisor, Dr. Andrews, did a cursory review and did not consider subjective complaints of pain and also did not give an explanation as to why he rejected the treating physician's opinions. And third, that there was no independent medical evaluation ordered, even though the plan allowed it. I'd like to go to the first ground. In finding that there was no change in condition, from the time that the approval period expired on October 3rd to the final decision of denial, there were essentially four documents submitted. The first document was from a physician advisor simply stating that he was treated on October 1st and his return to work date is continued to October 10th. There is no discussion about an examination or results thereof. The second document is –  I mean, there was a message being conveyed there, and I take it your position is that there wasn't enough justification for the position. But was there any reason to think that the position was based on nothing? Your Honor, I don't know if it was based on nothing. We do know that there are no notes. Well, then, you don't know – was there any further inquiry as to whether the doctor spontaneously or the medical office spontaneously sent this out or they did so in response to a complaint of pain or what? Absolutely, there was a further investigation. Sedgwick called the physician, Dr. Schweitzer, and they asked for the notes from the October 1st from the visit. And they came to find out that he didn't go on that day and there was no visit. Instead, what they got in return was a supplemental certification stating and confirming – reconfirming that he had gout, he had a history of gout, he failed to take his medication, and that his – his return to work date was November 1st because he didn't feel that he was able to go back to work. Again, there were no notes from an examination. There were no clinical tests. There was nothing to go by as far as supporting that opinion of a later return to work date. Then – then Sedgwick denies the claim, but it allows Mr. May to submit more documentation. And he does. He submits an MRI where Dr. Alagopon – Did they explain why they were denying it? Because there was no – No, no. No. Did you hear my question? Did they explain why they were denying it? I'm not asking you why they were denying it. I'm asking whether they explained. Oh, did Sedgwick explain why – Did they say there are no notes? Yes. They explained in their denial letter that there was no objective medical documentation to support a continued inability to do his job and or for restrictions that were stated. But you said something else. You said there was no visit. You just said that. That's – And you said there were no notes. That's quite different from saying what we got is not sufficient. Did they say, look, there was no visit, there were no notes? There – Is that what they said? Excuse me, Your Honor. In their journal notes, yes, there is – they note a call from Dr. Schweitzer's office after the receipt of the supplemental certificate saying that, by the way, the last date of his visit was October 8th, not October 1st. So technically there were two visits. That was September 10th and October 8th. I don't understand your answer. I'm sorry, Your Honor. And I may not be understanding your question. I believe you're asking – Did they say – did he get back and say, look, there are no notes, there was no visit, that's why we're denying it, or provide us proof of notes, show us that there was a visit? Was that what they asked for? Yes, Your Honor. When they called Dr. Schweitzer – I'm sorry, would they? When Dr. – when Mr. Dixon from Cedric calls Dr. Schweitzer, he asks her for notes. He asks her for documentation. And in explanation, I'm not quite sure if you're asking if he explained to Dr. Schweitzer why he was denying it or he explained to Mr. May why he was denying it. Well, it's somewhat the same thing. You know, if you explain to Mr. May, Mr. May can then tell Dr. Schweitzer or he can tell Dr. Schweitzer directly. But somehow, if there's something deficient with Dr. Schweitzer's diagnosis, was he told, look, here's what's the matter with it, here's what – here's what we need? Exactly. I'm asking, was that done? Exactly, Your Honor. And where is that? Your Honor, it is – it is in journal notes. Throughout this process, he is told what he – It should be an eon number.  I apologize, Your Honor. Your Honor, I'm sorry. I don't have it right in front of me. It is in his letter of denial dated November 2nd stating exactly why his claim was denied. So it wasn't along the way.  Like before we make a decision, here's what's the matter, give us more information. Here's what's missing. No, Your Honor. It's in the letter of denial. Didn't we say that in Saffron? Didn't we say that there has to be a dialogue? You have to sort of ask. You've got to tell him what he's got to do to fix it and give him a chance to fix it. Didn't we say that? Absolutely, Your Honor. And throughout this entire process, this record shows that from the time that Cedric gets this claim, they call Mr. May, they call Dr. Schweitzer, they send them letters, they're telling them exactly what they're looking for. What about the request, you have 24 hours to get this information back to us, and then that doesn't happen, and so they move on from there? Your Honor, before the initial denial, the first independent physician advisor, Dr. Henkamp, calls Dr. Schweitzer, and also Mr. Dixon, the disability specialist, calls her twice. They give her a period of time for about three days to call back just to set up an appointment to go through the file. Would you comment on the specific, when we get to the point where they say you have 24 hours, and then they go ahead and make their final decision? Yes, Your Honor. On appeal, after the appeal is filed, Ms. Patterson, who is the review specialist, calls up Mr. May, goes through the entire process, goes through his file, and lets him know that during the appeal that his physicians will be called, that they will make one attempt, that there may not, there's no guarantee that there will be a conference call, so that he needs to make sure he contacts each and every one of his physicians to let him know a call will be made, and that if they require a release to talk to Sedgwick, that he needs to get a release to them. He is put on notice that each of his physicians, and this is on appeal, each of his physicians will be called, and they were called. All four of the physicians were called, and not one returned the call. And 24 hours, I know that the district court raised that issue, but number one, Mr. May was put on notice. Number two, there's, in the plan, there's no requirement to call the physicians. And number three, they were called. It may not be in the plan, but our cases say that. Somehow he has to be given a fair chance to fill in whatever deficiencies. So whether it's in the plan or not, it doesn't matter. You're in the Ninth Circuit and you're bound by our case law. So there has to be sort of a fair chance. He has to be told, look, here's what's wrong with what you submitted, and we're giving you a fair chance to respond. I'm not sure that saying you've got 24 hours to get it in is a fair chance, but. No, Your Honor, that's not what happened in this case. When he files his appeal. I'm just repeating what you said. No, no. I know. But those 24 hours was calling his physician and letting them know, I'll be, and Dr. Andrews let each of his physicians know, I will be doing my report in 24 hours. So what happens is they call the physicians. Physicians don't call back. The plan then go back to him and say, hey, we didn't get a call back from your physicians. Better make sure they call us back or deny it or they just deny it. No, Your Honor. I'm just asking a question. No. You're right. It's an either or question. There's no know about it. It's either one or the other. I understand that. So which one is it? No. They did not call Mr. May. No is not a good answer for an either or. They did not tell Mr. May that they didn't get a call back. They call the physicians. They don't get a call back, and that's it. They deny it. No, Your Honor. I'm just wondering, is that the kind of meaningful dialogue we talked about in Safran? You know Safran? You remember Safran? I do know Safran. And this falls. It's a good opinion. It's an absolutely terrific opinion. Thank you. And it's a good guideline to file. I'm very fond of it myself. And I just always hope that lawyers will just sit there and just read out loud for edification, particularly lawyers with clients like yours. What May talks about is a meaningful dialogue between the claims administrator and the claimant. And this is her chat. You've got to really make it clear and give them a fair chance to fill in whatever deficiencies. And I'm just not sure that this happens here. Why don't you persuade me? Your Honor, there was discussion throughout. And I'd like to point this out, and I believe I'm reading Safran right when I say this. This meaningful ---- I'll tell you if you're not. I know you will. This meaningful dialogue comes into play when you are weighing the evidence and there is a conflict. If there's no conflict, there's no ---- Nope. You're reading it too narrowly. Pardon? Nope. You're reading it too narrowly. What it says is you've got to have a fair chance for the claimant to make a claim and to prove it up. You've got to have sort of let them know what's going on and give them a fair chance to respond. You know, it's sort of common sense. You know, it's not that difficult. It's common sense. So what in this record shows that that's what they did, that they gave him a meaningful, you know, they let him know what the problem is, and they gave him a meaningful chance to respond? Your Honor, the reason ---- And, you know, not your say so. What is in the record? You know, tell me what's in the record. Now, I've got the record here. I've got all the excerpts here, and you just tell me where to look. Your Honor, I apologize. I don't have the direct sites here. There is ---- You didn't bring the excerpts to court with you? Pardon me? You didn't have the excerpts? I do, Your Honor. Well, go get them. Okay. Thank you. The meaningful dialogue ---- No, no. Okay. Where is the page number? It's ---- Volume of excerpts and page number. It's actually the journal notes, Your Honor. Yeah, I know. But where is it? E.R. It starts at E.R. 322. Okay. Hold on. 322. I'm getting there. My E.R.s only go to 227. No, they didn't. There's two different numbers. E.R. and E.R. Yeah. My only go to 267. Your E.R.s? Yeah. Well, here you are. 270. We've got more. We've got more. Oh, there's a volume 3. I missed volume 3. I'm sorry. What number did you say? Your Honor, if we look at your ---- What number? Pardon me? Number. 356. 356. I missed volume 3. Sorry. 358. It describes ---- Okay. Where? I'm looking at 356 now. Sorry. This looks something called instructions of position. I know, Your Honor. So this is what was sent to the physician. They didn't respond to it. Is that what it is? Your Honor, if I could point your attention to E.R. 325. 325. Sure. So it really starts there where communications with Mr. May begin. It's ---- Okay. Where? I'm looking at 325. Telephone call from patient. It describes the discussion. But before that time, even on 323, it talks about Mr. Dixon calling and explaining the process, telling him what's needed, what types of documents are needed. I understand. But telephone says, look, if you're not happy with what they provide you, you've got to tell the patient, hey, here's what it is. We're not happy with what you provided. Look, and here's a chance to tell us more. Right. And here's how you go about it. So where is that in this record? In the initial? No, no. Where is that in this record? Let me ask. Go to page 329. And there are several entries like this, but there's an abbreviation. There's an entry that starts here. CMD Dixon, TCTEE at so on and so forth. Revised claim status denied, if no RTW today. I take it this is all standard acronyms used by the claims people. Can you tell me, is this what you're talking about? Is this a contact to the claimant? Telephone. Yes, it is. The telephone call I figured out. What's EE? I'm, you know, I apologize, Your Honor. I'm not quite sure what page you're on. I'm on 329. I just kind of picked one at random where I saw there are other entries that are similar. Telephone call with employee. Employee. Okay. Revised claim status and no additional medical receipt. And by the way. Well, it says if there's no RTW today. And no additional. No RTW return. Return to work. Return to work. If you don't return to work and there's no additional medical records to support continued disability, this claim will be denied. Now, this is on October 4th. This is after the expiration of his approval time. They're not denying it outright. They're allowing him time to submit documentation to support a continued disability. And then the next kind of paragraph. This paragraph seems to be a report with all these abbreviations. The next paragraph, BU 10.4.10 RTW date. And then there's what appears to be written text, some standard form of some kind or maybe a communication. What is that? That is a communication. Mr. Dixon is typing in what he's telling. The employee. He's basically saying at this point you can appeal. Is that what all that means? As a next step in your claim, you have an option of gathering all your medical documents with a request for appeal. Even though Mr. Dixon tells him that, he still allows Mr. May, before even filing Is there any way that explains to him what's deficient about what he has submitted to date? Which is what I thought our cases require. They say, look, here's what's wrong with what you've provided. If you want to fix it, here's what you need to provide. This is what I think our cases require. Is there anything like that? Yes. He speaks with Mr. Where are you? Where are you? I'm sorry. ER 328. This is before the expiration. Okay. There are lots of entries here. Can you tell me which one you're looking at? There's one on October 1st where he is. There are six on October 1st. It's the third one from the bottom. One, two, three. Okay. The one B025034604. Is that the one? Oh, no. I'm sorry. They're all the same number. CM Dixon. Is that the one where he says that he's going to see the doctor? Is that what you're referring to? Yes. And then below that, he also calls Dr. Schweitzer. I'm sorry. I didn't understand what your answer was to my question. What is in here where they tell him here's what's wrong with what you submitted to the date and here's what you need to do to fix it? Where is that on this page? I think, Your Honor. Let me just go ahead and see if this is what you're referring to, that one entry, the third from the bottom. Does this say, I advised employee to have MDO, whatever that is, submit medical for review if his disability is going to be extended or if he will require maybe prescriptions? And then EE, who's employee, VU. What's VU? I'm sorry. I'm forgetting what that stands for, Your Honor. But Mr. Dixon doesn't stop there. Right after that, he calls Mr. May's physician and requests the updated medical documents regarding his current disability status and expected return to work date. He speaks with the receptionist who confirmed that he's to visit that day. And they say, well, he can't give a report because he hasn't been here yet. And then the next thing we see of substance is basically your claim is denied on the fourth a couple days later because that's when he says, I'm still having a bad day. I can't bend my knee. I can't leave the house. He's reporting that. But that's basically when they say, now you have an appeal. So they call the doctor. The doctor says, the receptionist says, need to be seen by doctor still. That's correct. And then the next thing is three days later, we haven't got anything so you can appeal. They say, well, he does say we haven't gotten anything and you need to return to work. Can we go back one entry up before that? This is on 329 where it says EE, which I guess is employee, VU, whatever that is, and stated that he's having a bad day and can't bend his knee at all, so he hasn't been able to leave the house today. Says she saw, she? I'm sorry. I'm not exactly sure where you're reading from. Okay. You're looking at ER 329? Yes. Okay. There are two block entries in there. That's correct. Okay. I'm looking at the upper one. Okay. Okay. So if you read about three lines down, at the very end of the line there is a line that starts EEVU. Are you seeing it? Yes. Okay. EEVU and stated that he is having a bad day and can't bend his knee at all, so he hasn't been able to leave the house today. Says that she, I think that's he, so his doctor has some papers for facts to us, stated that his ET or ERTW date. Expected return to work date. Is 10-10. But what's difficult here is this. He goes, October 1 is a Friday. He has a 2010. He has an appointment with the doctor. He leaves a note with the receptionist to say we need something. They say, well, we can't give it to you yet because he hasn't been here. And then on Monday, so the weekend expires, on Monday they basically say game over. You know, if you don't give us this return to work, and here's how you file your appeal. So the problem is it's kind of littered with these sort of things where, you know, is that meaningful dialogue when you call the doctor and then two days later say, well, now you can file your appeal? But, Your Honor, I know that's what the notes say, but his initial denial didn't say. I know, but I can't do anything more than read what the notes say and do and put them onto the calendar and figure out what. I mean, we're not making a final judgment. We're trying to say was there a meaningful dialogue. Yes. I understand that. And why do you fight so hard when, I mean. Pardon me? I mean, why is this spot so hard to see, to not let him actually have a meaningful dialogue? It's, you know, and in my position, I see that there's communication throughout this entire process. It's not like he's not responding, so let's deny. It's he's not responding, let's call him, let's tell him, look, your final date is October 3rd. We haven't gotten anything. Then on October 4th, they still haven't gotten anything, but they still don't deny his claim. They let him submit a physician's assistant document which shows an office visit on October 1st. They don't stop there. They call Dr. Schweitzer and they say, hey, can we please have your notes from October 1st so we can see what happened, what kind of treatment, where is the basis for saying that his leave is extended to October 10th. They never get these notes. Instead, they get a supplemental certificate, and the supplemental certificate merely states what was stated before, and that is he has gout. He stopped taking his medication, and he's not ready to go back to work. That is not objective medical documentation to support his inability to work. If I were the claimant, I would sort of say, well, what else do you want from me? And how would you explain it to me? I mean, I've got a doctor. My doctor says I've got gout. I can't go back to work. Does this have to be a work-related injury? No. So it doesn't have to be a work-related injury. So you say he had gout as if having gout is something to be cheerful about, to celebrate. Gout can be painful and debilitating. So why isn't a certificate from the doctor saying he's got gout and he can't return to work? Why is that not? I don't understand it, so I'm not really surprised that Mr. May doesn't understand it. So what else do you want from me? If they wanted more, why were they required to send him a letter or make a call and say, look, this is what we need from your doctor or this is what we need from you? But you can't tell me right now what that thing is. What is it that if you had been there to tell them, to explain to him what they needed, what would you have told him to say? And he was told this, Your Honor. I can't hear you. Pardon me? You sort of faded out. I'm sorry. He was told that they needed objective medical documentation in the form of chart notes, office visit notes, clinical tests, results of examinations. I don't see any of that in here. Was this in writing? Was it a letter? Was there a phone call where they said? Is there anything more than what you've got here? Then... Is there anything else in the record that I'm missing? Your Honor, I don't want for this to be based on what I have told you here, because... Well, we don't want you to tell us here anything that's not in the record, but you can certainly tell us what's in the record. That's your job. I don't think you need to tell... You can't tell us what's outside the record, obviously. Is there something in the record we missed? No. Your Honor, besides telephone calls, he was... He was... If you turn to ER 371... 371, sure. This is his letter approving his claim. I'm sorry. Whose letter? Mr. May's claim. I'm sorry? This is the approval. I'm sorry. This is the approval letter to Mr. May. Okay. And the second paragraph states, in the event that you will not recover sufficiently to resume your job duties with or without reasonable accommodations, at the end of the approval period, updated medical documentation, including chart notes, diagnostic test results, hospital discharge summaries, et cetera, will need to be provided. Not one of those were provided before his approval date expired. Thereafter, when he was allowed additional time to submit documents, we have the PA note and we have Dr. Schweitzer's supplemental notes. Okay. I think we understand your position. You've taken more than your time. Thank you. Let me ask one. How much is at stake here? You know, Your Honor, it... Worst case from your perspective. It would be 60 percent of his wages for this is the worst case scenario. Right. Suppose he gets the entire period. I'm not saying that's the result. I'm just trying to figure out what are the players in this drama thinking is at stake. It would be, I believe it would be about, and this is a guess, about 60 percent of possibly $60,000. And I don't... You're not held to that. I just want to get a sense, a ballpark sense of what we're talking about here. And, Your Honor, and I have to say this. It's not the money. You want the guidance. You want another opinion to just tell you what to do, right? It's always the money. I didn't think I needed more guidance because, you know, this is a straight court of use of discretion. Then you will be grateful to get it, won't you? Pardon me? Then you'll be grateful to get it. Well, I don't know. In conclusion, Your Honor, we ask that the district court's ruling be reversed. There is an alternative issue that was at stake. Okay. Thank you. Thank you. Morning, Your Honors. Randy Noah on behalf of... Point the mic to your general director, your mouth. There we go. Morning, Your Honors. Randy Noah on behalf of Appley, Marcus May. If I might briefly just plow some new ground, I believe in this case what the district court pointed out quite accurately is that throughout the appeal process by the case manager and by the reviewing doctors for ATT, there never was any mention of the fact that Mr. May's job duty included standing eight hours on his feet. And that chair could not be used. And I believe that that is a very salient point in this, which the district court pointed out, that when the case manager and then the reviewing doctor, the paper reviewing doctor, which was Andrews, not one word is mentioned of the actual job duty to stand eight hours on his feet. And there's zero analysis of how could Mr. May, with the condition he had, stand on his feet for eight hours without use of a chair. And I think that point, which is also never addressed by the appellant in moving papers in argument, is a very salient point in this case, because that's the crux of this man's job on the sales floor. And when nobody addresses that, I believe that that really adds to the clear error in this case, along with the lack of explanation as to what document Mr. May could have brought. The fact is he brought every document to AT&T that he had from the medical records. Okay. What in those documents demonstrates his disability? Well, the – which there's a lot of talk about no objective record. There's an X-ray early on, and I don't know why it's found not objective by AT&T's doctor. It shows arthritis in the knee. There's not then following discussion on that, but arthritis in the knee leads to pain, as gout in the foot would lead to pain. And then on November 3rd, we have the MRI. And the MRI seems to be – I'm sorry. What date was the MRI again? November 3rd. Then the decision is, I believe, December 10th to deny the benefits. So November 3rd, we have the MRI, which shows the ligament injury. You have the partial disruption of the anterior cruciate ligament and posterior cruciate ligament. And, again, there's zero discussion why that would not cause a limitation for this patient to stand eight hours on the sales floor without a chair. I confess, I'm not a doctor. I read the MRI report, and I don't know what it means. I mean, obviously, I recognize some of the individual words. It doesn't seem to describe an extreme condition. I mean, there are references to mild and limitation and so forth. No – was it tear? What is it I'm supposed to look at in this to be persuaded that – I mean, you've acknowledged the abuse of discretion standard applies. And I take it you acknowledge that the claimant has got the burden of establishing the abuse of discretion. Okay. What can I look at that establishes the abuse of discretion? You're pointing to the MRI findings. What should I find in here that tells me? That there is a noted partial disruption of the ligament. You have a ligamentous injury in the ACL and PCL, the anterior cruciate ligament and posterior cruciate ligament. That partial disruption is not a complete tear. So the ATD doctor and the position of the plan is there's not a tear. They keep referencing not a tear. Yes, a partial disruption would be a tear of the fibers. And that – you can't get more objective evidence than an MRI and an X-ray. How they're interpreted then, obviously doctors could do differently, but you have to discuss it. You can't have an interpretation if you don't ever examine or talk about it. And if you believe that's insufficient, you could then set another MRI or have a radiologist for ATT examine. There was a radiologist at Highland Hospital who wrote the report. Well, that's not their obligation, isn't it? Isn't that really where the claimant comes in to say, well, I'll get another one? Yes. It would be the – which the claimant then did get the MRI and brings it to AT&T. Beyond that, and it's interpreted by the doctors, again, yes, there's a lack of Mr. Mays treating doctors' discussion about exactly why, if you have a partial disruption of the ligaments or you have arthritis in the knee, why would that limit you from standing eight hours? But he does bring the documents. We know from the record that he has to stand eight hours on the job. He tells over the – he tells in the phone conference that he has to stand – he can't stand eight hours on the job. And it's all the records that are available. We haven't missed anything. Mr. May has not missed any record. He brought every record, but those records weren't – were not – were not analyzed or interpreted. In fact, it appears maybe nobody saw them. Why don't we defer to the claims administrator? He provides the records. Why is the situation where we defer to the claims administrator? There's no conflict, right? So – so – Correct. There's no conflict. This would be – this would be a clearly erroneous decision. This would be – That's a pretty high standard. It's a very high standard. I don't think that you can meet it very often. I think this case does. I think you have to pitch a perfect game to hit it. And here, when you have – you have the lack of any discussion about, like the objective evidence, you have a total lack of acknowledgment of the man's job to stand eight hours on his feet. You have the man bringing every document there is to AT&T, and then there's not, as we've been discussing, further dialogue on, okay, you need additional beyond what you brought us. You have a case which – So the claim was denied in – on December, right? I believe it was December 10th. Right. And then there was an appeal. No, that's the second denial. But that's the second denial. And then that's it. And then it's an exhaustion of the – of the administrative appeal process, and then the only option being – Okay. So there was an appeal. There was an administrative appeal. Yes. Correct. Correct. And were these points raised on appeal? Yes. Mr. May represented himself, and he simply wrote one letter. He wrote what was about probably one long paragraph. That was it. And he noted on there that he brought the MRI, the X-ray, that he could not stand for eight hours on the job. That was the sum and substance of Mr. May's appeal. It was typed. It wasn't handwritten. But it was very brief. And it really was just a brief summary of literally all the records that were available, which are not many records. So how much does he need to say in his appeal to preserve those points in his administrative appeal? How much does he need? If the complaint was, look, you didn't discuss, the decision does not discuss the fact that I need to stand eight hours a day, the fact that there is a subjective evidence. If that is his complaint, does he have to raise it in his administrative appeal? Well, he did. You think he did? He has to, and he did. Mr. May raised those exact points. It's written, you know, it's not as a lawyer would do, obviously, but he raised that exact point. I can't stand for eight hours on my job. It's a job requirement because of my knees. If he wears it on the MRI? In that, where it is his appeal in the record, I would have to – I can get that record for you. Go ahead. This is – you're looking for his appeal letter, right? It's simply about a half page. No, I understand. That's what I want to look at. I may have some questions about it. Sure. Is there a requirement that he states the grounds in the administrative appeal? I don't remember what the law is on that. Is it a requirement that he state – Yes, that the administrative appeal raise the grounds? Is it sort of like in the – I do not believe that is a requirement, Your Honor, that if he were to fail to state a ground, like, that he couldn't state a ground. I just don't know. I don't believe that's a requirement. I believe it could be raised by – at the district court. I think what happens then is it allows the record to open on that issue, whereas otherwise it might be closed so that it could be developed. Okay. Well, if you don't have it, maybe you can – I don't have it in front of me. It's in the volume. I don't have his appeal letter, the ER number, directly in front of me. But while looking, if I can try to answer any other question, or if I could come back to that point. You can come back to that point. I have 38 seconds left. There's – No, you actually have 40 seconds in the whole. Oh, I'm sorry. I am. Did you have anything else? The change in circumstances here, Mr. May died November 2012. That changes the remedy portion. And what Mr. May would argue at this point is that the remedy should be benefits to his date of death, because he has no opportunity now to go back and file the long-term disability application, which he could not do because the short-term was denied. And following the Pennybecker case, that would seem to be the correct remedy at this point, is the benefits up to the date of death under the long-term disability plan. The definition of the claim you're kind of presenting on the fly, this wasn't presented to the district court, right? No, because it couldn't be. And it wasn't presented to us until you started opening your mouth 20 seconds ago. No, because he died. Is that how you present a new claim to the court? No, Your Honor. I'm noting the circumstance, but because he died recently. How recently? He died November 2012. So that's like nearly two years ago. And now you're asserting a new claim based on that? Well, I mean, I hear what you're saying, but it seems to me there's got to be a better way to put that in front of the court than mentioning it at the tail end of oral argument when you're already in deficit. I think it should go back to the district court. I think it is an issue that should be examined by the district court, because it is a new issue. Did you ask for this relief in your brief? No, Your Honor, because he was alive. What would happen if he had not died? So he died after the district court entered judgment? Yeah, and after the submission of the briefs, yes. Well, actually, your brief is December 2012, but you may not have known about death  Correct. I did not know he was he had died at that point. I'm sorry? Yeah. I did not learn of his death until after the submission of the brief. He had died. He had died shortly. And you didn't find anything since then seeking this relief? Correct, Your Honor. Is this in sort of a roundabout way of answering just Clifton's question of what's at stake here? Well, it would raise what's at stake, but that's not necessarily my point. I mean, there's not the benefits are very low. What is at stake here? In terms of dollars, on the short-term disability, it's by the AT&T's position, they had argued it was in the $2,000, $3,000 range. By Mr. May's position, if you take in commissions, it's $10,000 to $15,000. There never was much. Plus attorney's fees. Then there's attorney fees. Okay. Thank you. Thank you. Okay. You took more than your time, but if you'd like a minute for a bottle, you may have it. Yes, Your Honor. One minute. Thank you. The document that the documents referred to by Mr. Noah is the x-ray which was submitted initially when the claim was approved. After the appeal is filed, Mr. May is given an opportunity to provide more documents, and what he did was he provided the MRI and the MRI report again. As Mr. Noah stated and is clear from the record, all of the documents available were before CEDRIC, before it made its decision. There is nothing implausible or illogical about their decision. And it is based on the evidence. Well, the MRI. What's wrong? I mean, the MRI demonstrates arthritis. Apparently, it's determined he has gout. I look at Dr. Andrews' report, and it says in a sort of conclusory matter, that doesn't prove it, without much more explanation. And frankly, for somebody who's supposed to be on his feet for eight hours a day, I can imagine having arthritis or gout would be a problem. That's true, Your Honor. In some circumstances, it might be. But he was diagnosed with this arthritis, and he was diagnosed with this gout from day one, from the time that he submitted this claim. And his own treating physician, in her last certification, she stated he can return to work on November 1st, even if he's under treatment, without any restrictions. That was her label. Is there an understanding at that point that it seems to me what's missing in the record is people passing in the night over the fact that return to work, imagining he can sit in his chair four hours part of the day, as opposed to he must be on his feet, which ATT requires. Right. So, I mean, that's where I think there's a gap here. But the records do show, Your Honor, that the documentation didn't substantiate the restrictions that were stated. Well, how not? I don't understand. How, you know, he's a guy who has to stand on his feet for eight hours. His doctor says he's got gout, he's got arthritis. There's an MRI showing inflammation and partial, partial damage or some damage to the ligaments. And it isn't up to the claims administrator to say, well, here's what's wrong with this. Here's where we think you can stand for eight hours a day, five days a week, despite all of this. And I don't see that in the record. I still don't understand why. I mean, I've looked at this and I've listened to you talk for almost half an hour now, and I still don't get it. So if it were my claim, I'd be baffled. And I think that means the claims administrator didn't do its job under our case law. I mean, maybe there's something there, but they've got to sort of explain it in ways that a claimant, even without a lawyer, can understand. Dr. Andrews, when he looked at the MRI, he saw that there was no tear, there was no sprain. And does he say, and this man can stand for eight hours a day without sitting, can work for eight hours a day where the employer prohibits the use of a chair on the sales floor? Your Honor. Does Dr. Andrews say that? He states in his report. Okay. Let me, let me, let me, why don't you start with a yes or no, and then you can explain all you want. Does he say? Yes. He does. Not in so many words, Your Honor. He does state that the documents do not show that an inability to do his job duties. Does he say, does it show that he understands that this man has to stand eight hours a day? Yes. Is there anything in Dr. Andrews' says that would convince, would convince me that he even knows that this man is supposed to stand eight hours a day doing his job? Yes, absolutely. Okay. ER-415 is Dr. Andrews' report, and he starts. Okay. 415. Okay. 415. I am with you. Okay. I got it. Very top, it talks about Mr. May's job duties. Requires ability to lift 25 pounds and able to stand for long periods of time while servicing customers. But that's kind of different. You know, I mean, I think everyone thought he could sit part of the time. You can stand for long periods. That doesn't say what ATT says and gives you a new appreciation for going into the ATT store when you realize these guys can't even sit down for part of their job. They have to be on their feet for eight hours a day. And that doesn't say it. So my question is, how do you square that with 373 where the PA says may resume work and then says four hours a day but may need chair to sit? That's right, Your Honor. How do you square those two? That particular certificate is the certificate where Sedgwick called Dr. Schweitzer and said, we need your notes about that treatment on that day. And there is nothing in the record that shows that he couldn't take a break for an hour and rest if he needed to. What the record shows is that there can't be a chair on the sales floor. That doesn't mean he can't take a break. But now you're interpolating. You can imagine that he can say in the middle of the day, excuse me. They basically said we can't accommodate you. But now you're extrapolating and saying, well, maybe he could go sit in the closet for an hour in the middle of the day and then come back out and then sell some telephones. But that's not in the record. And I apologize. You're right. It's not in the record. Okay. And we don't need to talk anymore about something that's not in the record. I mean, I think the difficulty is this. I really see this case as one where people are kind of passing in the night over the real issue. The real nut doesn't kind of get addressed. And it's a little unclear to me how Dr. Andrews saying he can stand, I don't know what that means. He can stand uninterrupted. Because most jobs, frankly, you can sit down sometimes. I was surprised. I understand, Your Honor. But Dr. Andrews, he's basically reviewing the records. He's saying the documentation there doesn't support an inability to do his job. And I have your point in mind. Okay. Thank you. And the report is reliable. Thank you. It looks to me like you need more guidance. Thank you, Your Honor. Here's your second sense of it. You know, counsel are here, you know, and this is a courthouse. We – cases are often settled after argument, after counsel. If they really listen to what we have to say, sometimes they say this is a good time to settle because our – the issues have been clarified for us. So if counsel do settle, let us know before we write that clarifying opinion. Okay? Thank you, Your Honor. All right. Case is signed. We'll stand a minute. If you want us to defer submission or withdraw submission because you're engaged in serious settlement, let us know in the next 24 hours. Otherwise, we'll proceed and decide the case. Thank you.
judges: KOZINSKI, McKEOWN, CLIFTON